DECISION
On August 16, 2003, a disturbance occurred on Ohio Avenue in Providence. Shortly after the police officers arrived and attempted to place one suspect in custody, the disturbance intensified. Ms. Cabral is accused of having bitten one of the police officers during the fracas, and is charged with a violation of R.I.G.L. § 11-5-5, and other assault crimes.
Ms. Cabral filed a motion to dismiss in March, 2004. The hearing date was continued by agreement when the attorneys were unavailable. Some settlement discussions were held and eventually the case was reached for trial. The motion to dismiss was then revived,[1] causing a further delay in trial.
Ms. Cabral contends that as she is alleged to have bitten an officer, she did not "strike" the officer and hence cannot be held responsible under § 11-5-5. She also claims that a prior agreement was reached shortly after arraignment, agreeing to dismiss this Count.
The language of the statute is clear and unambiguous. R.I.G.L. § 11-5-5 states:
 Any person who shall make an assault or battery, or both, by knowingly and willfully either (1) striking, or (2) spraying with a noxious chemical, commonly used as a personal defense weapon, including Mace and an oleoresin capsicum product or like products, a uniformed member of the state police or . . . city or town police officer . . . causing bodily injury while the officer or official is engaged in the performance of his or her duty, shall be deemed to have committed a felony, and shall be imprisoned not exceeding three (3) years, or fined not exceeding fifteen hundred ($1500) dollars, or both.
While the statute establishes a crime for assault and battery, it specifically describes the acts constituting this felony. The language of this statute does not include every assault or battery. Other statutes enacted by the Legislature at or after the enactment of this section are far more general and included almost all assaults and batteries. (See, for example, R.I.G.L. §11-5-10, 11, and 2). The felony must consist of either a striking or a spraying. There is no question that a spraying did not occur; instead defendant Ms. Cabral alleges that her biting did not constitute a strike.
Ms. Cabral has provided a copy of the American Heritage Dictionary of the English language, 4th ed. 2000 which lists the following definitions of striking.
 1(a) to hit sharply, as with the hand, the fist or a weapon;
 (b) to inflict open "blow"; (2) to penetrate or pierce: was struck in the leg by a bullet (3)a to collide or crash into
. . .
The Attorney General does not question that the primary definition of striking is the hitting sharply. However, penetrating or piercing, as with a bullet is a common alternate definition. If a statute is clear and unambiguous, it is to be interpreted by its obvious meaning.[2] Penal language, when ambiguous, is construed in favor of the accused, State v.Bryant, 670 A.2d. 776, 779 (R.I., 1976), but the statute is clear and there is no need for interpretation. A striking is a sharp hit, or a piercing.
 APPLICATION OF THE MOTION TO DISMISS STANDARD UNDER RULE 9.1
This is a pre-trial motion to dismiss pursuant to Rule 9.1 of the Rhode Island Rules of Criminal Procedure. Rule 9.1 states:
INFORMATIONS: MOTION TO DISMISS
 A defendant who has been charged by information may, within thirty (30) days after he or she has been served with a copy of the information, or at such later time as the court may permit, move to dismiss on the ground that the information and exhibits appended thereto do not demonstrate the existence of probable cause to believe that the offense charged has been committed or that the defendant committed it. The motion shall be scheduled to be heard within a reasonable time.
This Court looks to the four corners of the complaint and its attachments to determine whether or not probable cause exists.State v. Reed, 764 A.2d 144 (R.I., 2001). The complaint in this action is hefty as it includes a number of attached police documents. One report states
 As [another person] fought violently with police, two other family members later identified as Diana Cabral, dob 9-08-81 and Anna Vieira dob 03-05-84 jumpon [sic] PTLM Gencarella and PTLW Guerette's backs pulling at their arms in an attempt to free Adelino Cabral. After Adelino Cabral was successfully handcuffed, police grabbed Diana Cabral and Vieira to arrest them as well. Both D. Cabral and Vieira fought violently as well with the police . . . PTLW Guerette took Vieira to the ground when D. Cabral jumped on PTLW Guerette pulling her away from Vieira. PTLM Gencarella was continuing to fight with D. Cabral at which time she grabbed the right forearm of PTLW Guerette and bit into it breaking the skin and causing immediate bruising. Complaint attachment 3, Uniform Report of Providence Police Department August 15, 2003.
This report indicates that even after the accused were pepper sprayed, "they continued to fight". Ibid.
 A statement of PTLW Guerette, also attached to the complaint, states in part that
 . . . Diana Cabral, dob 09-08-81 and Anna Vieira dob 03-05-84 jumped on PTLM Gencarella and my backs pulling at our arms in an attempt to free Adelino Cabral.
 . . . Both D. Cabral and Vieira fought violently by punching and kicking us.
 . . . PTLM Gencarella was continuing to fight with D. Cabral at which time she grabbed my right forearm and bit into it breaking the skin and causing immediate bruising. Statement of PTLW Guerette, August 14, 2003, criminal information, attachment 4.
There is ample information in the complaint to indicate that PTLW Guerette was hit sharply by the hand, fist or arm of Diana Cabral, by Diana Cabral. Hence, the information and exhibits appended thereto demonstrate the existence of probable cause to believe that the offense charged has been committed or that the defendant committed the offense. The charge alleging a violation of R.I.G.L. § 11-5-5 is sufficient.
 AGREEMENTS AMONG COUNSEL SHOULD BE HONORED
Ms. Cabral alleges that an agreement was reached at the District Court level wherein the prosecutor would not charge for a violation of R.I.G.L. § 11-5-5. Shortly thereafter, the felony charge proceeded, bringing the matter to Superior Court. Page 10 of Defendant's Supplemental Memorandum states "the State . . . accepted the compromise". It also refers to the defendant as being "hoodwinked" on the District Court level, as she relied upon the prosecutor's assurances, opting not to proceed with a prompt hearing.
Our Supreme Court held that specific performance of a plea agreement would not be allowed before the plea was ratified by the Court. In State v. Trepanier, 600 A.2d, 1311 (R.I. 1991), no agreement was enforceable where the State's offer had been withdrawn before defendant accepted it. However, Trepanier
decision does not conclude that all settlement agreements by prosecutors are unenforceable, as the State infers. Indeed, the Supreme Court has held prosecutors to a much higher standard by setting forth special responsibilities for them in Disciplinary Rule 3.8 in the Rules of Professional Conduct for attorneys.
Civility among attorneys is a growing concern for the courts. An old English proverb reminds us that one's word is his or her bond.[3] Despite the considerable increase in the number of practicing attorneys in the Bar over the past twenty years, a decline in the mutual respect among members of the Bar is unjustified.[4] This Justice continues to believe that the practice of law is a profession of honor and should continue to be a profession of honor. Simply put, if an agreement has been made, it should be kept. If an agreement has not been made, it should not be alleged.
If the defense contends that some separate enforceable agreement has been entered, and the breach of that agreement prejudices the defense, a hearing will be scheduled promptly.
 CONCLUSION
The information and exhibits appended thereto demonstrate the existence of probable cause to believe that the offense charged has been committed or that the defendant committed the offense. The motion to dismiss is therefore denied to that extent.
If, however, defendant contends that some separate enforceable agreement has been entered, and the breach of that agreement prejudices her, she shall schedule a hearing forthwith. The defendant shall inform the clerk of the Daily Criminal Calendar of her desire for a hearing within seven (7) days of this decision. If no request is received, this case shall be placed on the trial calendar promptly.
[1] Superior Court Criminal Rule of Procedure 9.1 requires motions to dismiss to be filed within 30 days of the information. Filing motions and not presenting them to the court for decision needlessly prolongs cases and defeats the purpose of this rule.
[2] As Chief Justice Williams, speaking for the Court, recently stated: According to our established rules of statutory construction, "`[w]hen the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of the statute their plain and ordinary meaning.'" GemPlumbing Heating Co. v. Rossi, 867 A.2d 796, 811 (R.I. 2005). The plain meaning of the statute is the best indication of the General Assembly's intent. State v. Grayhurst, 852 A.2d Thus, the rules of statutory construction will be applied only if the statutory language is ambiguous. Rossi, 867 A.2d at 811. Furthermore, we will not construe the statute "`to reach an absurd or unintended result.'" Harvard Pilgrim Health Care ofNew England, Inc. v. Gelati, 865 A.2d 1028, 1038 (R.I. 2004).Park v. Rizzo Ford, Inc., 893 A.2d 216, 221 (R.I., 2006).
[3] Cervantes put it far better in his legendary novel Don Quixote "Honesty's the best policy" III, 33, p. 666 and "An honest man's word is as good as his bond." III, 34, p. 674.
[4] In upholding an award of sanctions, the Wisconsin Supreme Court found "civility, candor and professionalism are on the decline in the legal profession and that unethical, win-at-all-costs, scorched-earth tactics are on the rise."Chevron Chemical Co. v. Deloitte Touche, 176 Wis.2d 935, 945,501 N.W.2d 15, 19 (1993). The court noted "improper attorney conduct harms not only the parties, but also the judicial system's effectiveness." Id. at 946, 501 N.W. at 20. For a broader discussion of the decline of mutual respect in the legal profession and the `civility crisis' see Comment: EthicalVersus Procedural Approaches to Civility: Why Ethics 2000 ShouldHave Adopted a Civility Rule, C. Piazzola, 74 U.Colo. L. Rev. 1197 (Summer, 2003).