ASPEN SERVICES, INC., Plaintiff-Appellant-Cross-Respondent,

v.

IT CORPORATION, Defendant-Respondent-Cross-Appellant.

Court of Appeals

*No. 97–0897. Submitted on briefs March 30, 1998.—Decided June 10, 1998.*

(Also reported in 583 N.W.2d 849.)

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Gary A. Ahrens* and *John J. Kalter* of *Michael, Best & Friedrich, LLP* of Milwaukee.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the briefs of *Richard Esenberg* of *Foley & Lardner* of Milwaukee.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

ANDERSON, J. Aspen Services, Inc., obtained a judgment against IT Corporation for unpaid rent under an equipment lease. Aspen appeals from the judgment because it was only awarded a portion of its request for $112,985.37 as attorney's fees and costs. IT cross-appeals from the judgment and argues that under the lease agreement Aspen was not entitled to any award of attorney's fees and costs. We affirm the judgment.

In October 1994, IT leased dredging equipment from Aspen. Aspen commenced this action to recover unpaid rental fees. IT filed a counterclaim alleging breach of warranty, breach of contract and conversion. After discovery and three motions by Aspen to dismiss IT's counterclaims, the case was tried before a jury on January 30, 1996. The counterclaims were not submitted to the jury because of rulings made by the trial court with respect to a limitation of liability included in the written lease agreement. The jury awarded Aspen $18,329.03 for unpaid rent. The trial court awarded Aspen a portion of its attorney's fees and costs of litigation.

We first address IT's cross-appeal because it raises the threshold question—whether under the lease agreement Aspen was entitled to an award of attorney's fees and costs. The lease provided: "Lessee shall

pay all costs, expenses and reasonable attorney fees that may be incurred or paid by Lessor in enforcing the covenants and agreements of this Lease." IT argues that the contract only allows Aspen to recover attorney's fees necessary to make Aspen "whole" on Aspen's claim for unpaid rent and does not entitle Aspen to any fees relating to defense of IT's counterclaim.[1]

Aspen's defense against IT's counterclaim was that the lease stated that the equipment was accepted "as is" and that there were no warranties of any kind. Thus, Aspen was enforcing the negation of warranties contained in the lease. The provision for attorney's fees encompasses the enforcement of the provisions of the lease. We conclude that Aspen was entitled to recover attorney's fees in defense of the counterclaims.

IT also contends that because Aspen rejected prelitigation settlement attempts, the litigation costs Aspen incurred were per se unreasonable and therefore not recoverable under the lease provision allowing recovery of "reasonable" fees. A per se rule is not applicable to bar the claim entirely. IT's suggestion that the resulting litigation was unreasonably pursued bears only on the determination of the amount of fees and costs awarded. We turn to that issue as raised by Aspen's appeal.

Aspen sought to recover a total of $112,985.37 in attorney's fees, costs and disbursements. The trial court only allowed $68,011.30, including interest on the verdict to the date of the judgment. Aspen argues that the trial court erroneously exercised its discretion in denying Aspen, as a sanction for the incivility of its attorney, more than $44,000 in attorney's fees and costs.

---

[1] We reject Aspen's contention that IT did not raise this issue in the trial court.

Relying on *Herro, McAndrews & Porter, S.C. v. Gerhardt*, 62 Wis. 2d 179, 184, 214 N.W.2d 401, 404 (1974), Aspen contends that "when the reasonableness of attorneys fees is challenged on appeal, the appellate court is not bound by the trial court's findings and is required to make an independent review of the matter and make its own determination of reasonableness." Aspen is wrong.

■

The *Herro* standard of review was rejected in *Standard Theatres, Inc. v. Department of Transportation*, 118 Wis. 2d 730, 747, 349 N.W.2d 661, 671 (1984). In *Standard Theatres*, the supreme court recognized that the trial court is in an advantageous position to decide the reasonableness of requested attorney's fees. *See id.* It is the trial court that observes the quality of legal services rendered, it is aware of the costs incurred in operating a law practice, and it knows or can readily find out the going rate for legal services in the community.[2] *See id.* Accordingly, we will give deference to the trial court's exercise of discretion. *See Village of Shorewood v. Steinberg*, 174 Wis. 2d 191, 204, 496 N.W.2d 57, 62 (1993) ("Our review of the circuit court's determination of the value of attorney's fees is limited to determining whether the circuit court properly exercised its discretion."). Here, deference to the trial court's determination is even more appropriate because the award of fees and costs was reduced to

---

[2] Here, the process employed by the trial court shows why it is in the most advantageous position to rule on attorney's fees. In ruling on Aspen's request for attorney's fees, the trial court drew on its own experience in similar contract cases with significant counterclaims. The court prudently surveyed the time, expenses and fees incurred in other cases and used the results as a reasonable standard for comparison with Aspen's request.

promote civility in litigation, a matter over which we have charged the judiciary to exercise more control by appropriate sanctions. *See Gainer v. Koewler*, 200 Wis. 2d 113, 123–24, 546 N.W.2d 474, 478–79 (Ct. App. 1996); *see also Chevron Chem. Co. v. Deloitte & Touche*, 176 Wis. 2d 935, 946, 501 N.W.2d 15, 20 (1993) (review sanctions under an erroneous exercise of discretion standard).

■

Aspen argues that incivility alone cannot support a reduction in recoverable attorney's fees and costs. The "character and importance of the litigation" are factors to be considered in determining the reasonable value of attorney's fees. *See Herro*, 62 Wis. 2d at 184, 214 N.W.2d at 404.[3] The trial court specifically mentioned these factors in determining the reasonableness of attorney's fees. The trial court found that the litigation was a relatively simple contract case but had "burgeoned" into something in which the attorney's fees were out of proportion to the result. The court made an analogy to "overtrial" which is grounds for shifting the burden of attorney's fees in family law

[3] In *Herro, McAndrews & Porter, S.C. v. Gerhardt*, 62 Wis. 2d 179, 184, 214 N.W.2d 401, 404 (1974), the supreme court catalogued the factors that should be considered in determining the reasonableness of attorney's fees, including:

> [T]he amount and character of the services rendered, the labor, the time, and trouble involved, the character and importance of the litigation, the amount of money or value of the property affected, the professional skill and experience called for, and the standing of the attorney in his profession; to which may be added the general ability of the client to pay and the pecuniary benefit derived from the services. [Quoted source omitted.]

cases.[4] The finding that there was excessive litigation justifies the trial court's reduction of Aspen's requested attorney's fees and costs.[5]

Aspen is correct in its assertion that the new rules of civility, SCR 62 "Standards Of Courtesy And Decorum For The Courts of Wisconsin," are not enforceable by the Board of Attorneys Professional Responsibility. *See* SCR 62.01. However, it is mistaken in its belief that the rules in SCR 62 and SCR 20 cannot be the basis for imposing a sanction for incivility during litigation. The trial courts and the appellate courts of this state do have statutory and inherent authority to enforce civility in the courtroom that is not dependent upon SCR 20 or SCR 62. *See Chevron,* 176 Wis. 2d at 946–47, 501 N.W.2d at 20. In *Chevron,* the supreme court wrote that "civility, candor, and professionalism are on the decline in the legal profession and that unethical, win-at-all-costs, scorched-earth tactics are on the rise." *Id.* at 945, 501 N.W.2d at 19–20. The court emphasized that "[i]mproper attorney conduct harms

---

[4] The policy underpinning an "overtrial" attorney's fees award in family law cases is to compensate the "overtrial" victim for fees unnecessarily incurred because of the other party's litigious actions. *See Johnson v. Johnson,* 199 Wis. 2d 367, 377, 545 N.W.2d 239, 243 (Ct. App. 1996).

[5] Aspen does not challenge the trial court's finding that "the result is out of proportion here to the attorneys fees that were generated in this case" and "the resultant verdict doesn't justify the amount of money expended." *Herro* requires the trial court to consider the "amount of money or value of the property affected." *Herro,* 62 Wis. 2d at 184, 214 N.W.2d at 404. We agree with the trial court that the request for $112,985.37 in attorney's fees, costs and disbursements to secure a judgment of $18,329.03 and successfully defend a significant counterclaim is grossly out of proportion to the final result.

not only the parties, but also the judicial system's effectiveness." *See id.* at 946, 501 N.W.2d at 20. To counter the decline of ethics and civility, the court held that "[t]he authority to impose sanctions is essential if circuit courts are to enforce their orders and ensure prompt disposition of lawsuits." *See id.* The purpose of sanctions is to punish the wrongdoers, to deter future incivility and unethical practices, *see id.*, and to punish conduct that disrupts the administration of justice, *see State v. Foster*, 100 Wis. 2d 103, 109, 301 N.W.2d 192, 195 (1981).

In this case, we conclude that the trial court's authority to reduce fees and costs for incivility arises from both its inherent and statutory authority. The court's inherent authority can be found in the *Herro* factors it must consider in setting reasonable attorney's fees. The statutory authority can be found in § 802.05, STATS., which provides that the signature of an attorney on a pleading is a certification that the pleading is not being used to needlessly increase the cost of litigation.[6] The trial court found that Aspen's attorney engaged in conduct which impeded IT's efforts to settle the dispute prior to the start of the lawsuit, failed to attempt to expeditiously reconcile differences

---

[6] Section 802.05(1)(a), STATS., provides in part:

> Every pleading, motion or other paper of a party represented by an attorney shall contain the name of the attorney. The signature of an attorney constitutes a certificate that the attorney has read the . . . motion . . . [and] that to the best of the attorney's . . . knowledge, information and belief, formed after reasonable inquiry, the . . . motion . . . is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that the . . . motion . . . is not used for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

through negotiations and the character of the services rendered was inappropriate.

Implicit is the finding that the cost of resolving the dispute was needlessly increased by Aspen. Further, in awarding only reasonable fees, the court may consider whether costs could have been avoided by a reasonable and prudent effort. *See Cedarburg Light & Water Comm'n v. Glens Falls Ins. Co.*, 42 Wis. 2d 120, 125, 166 N.W.2d 165, 168 (1969). This premise has been interpreted to mean that "[a] plaintiff may not unnecessarily run up its legal bill in the expectation that the breaching party will ultimately pick up the entire tab." *Fidelity and Deposit Co. v. Krebs Engineers*, 859 F.2d 501, 506 (7th Cir. 1988).

The trial court did not make particularized findings of fact identifying each and every act of incivility it believed warranted a reduction of the requested attorney's fees. The trial court relied upon the entire record, including all available transcripts, rather than undertake the time consuming and daunting task of retrying the entire lawsuit. Under the circumstances, it was not a misuse of discretion for the court to characterize counsel's conduct rather than particularize that conduct. We have independently reviewed the record and we conclude that the trial court's determination to reduce the amount of attorney's fees and costs because they were excessive was within the court's authority and was the sound exercise of discretion. Such a "sanction" for attorney misconduct is appropriate to both penalize the offender and deter future misconduct. *See Chevron*, 176 Wis. 2d at 946, 501 N.W.2d at 20.

Throughout these proceedings, Aspen has been represented by Gary A. Ahrens and John J. Kalter of

499

Michael, Best & Friederich, LLP and IT was represented by Scott R. Halloin of Foley & Lardner. When ruling on the request for attorney's fees, the court began with a summary of the settlement efforts that occurred prior to the commencement of the action. The court commented, "This type of activity can only drive up the costs because it demonstrates an attitude that is not amenable to negotiation and settlement of preliminary matters before you get into court."

On March 7, 1995, Ahrens made a written demand on IT for $19,503.80. IT's corporate counsel, S. Reed Waters, Jr., responded on March 9, 1995. His letter began by acknowledging an earlier telephone conversation with Ahrens and continued, "It is unfortunate that we could not professionally discuss our respective client's positions in order to facilitate a possible settlement of this matter." Waters then proceeded to offer to pay $14,948.75 and to forfeit a $5000 security deposit in full settlement of Aspen's claim against IT. On March 31, 1995, Ahrens and Waters had a telephone conversation. In response to Waters' inquiries as to what would be needed to settle the matter, Ahrens replied, "You figure it out." On March 31, 1995 and April 7, 1995, Waters wrote to Kalter again offering to settle the matter. In the later letter, Waters also requested a thirty-day extension to file an answer to the complaint that was filed March 22, 1995. Kalter responded on April 10, 1995, returning IT's checks totaling $14,498.75, rejecting any offer based upon the original purchase order for the rental of equipment from Aspen and granting a seven-day extension for IT to file an answer.[7]

---

[7] Aspen argues that it was improper for the trial court to rely on conduct in settlement discussions because § 904.08, STATS., bars the use of such discussions for liability purposes.

The record supports the conclusion that the trial court was needlessly called upon to settle multiple discovery disputes. In reducing the requested attorney's fees, the trial court concluded that Ahrens' incivility "outweighs the discovery of things that IT did wrong or didn't do wrong." The court "did not see the necessity of some of the activity that plaintiff's counsel engaged in that defendant IT Corporation's counsel indicated were intimidating, unnecessary practices from his aspect." The court was disturbed that Ahrens, Kalter and Halloin made no attempt to reconcile discovery disputes. Ultimately the court appointed a referee to oversee discovery.

The discovery disputes started within two months after the action was commenced when Ahrens filed a motion for a protective order seeking to postpone a deposition scheduled for May 24, 1995, by notice

The trial court's determination of reasonable attorney's fees and costs was not a liability determination. The trial court stated that the attorney's fees generated by Ahrens and Kalter were not reasonable because the case started with a settlement offer. We are not persuaded that *Hughes v. Chrysler Motors Corp.,* 188 Wis. 2d 1, 17 n.5, 523 N.W.2d 197, 204 (Ct. App. 1994), as cited by Aspen in its reply brief, has any application here. In *Hughes,* the court found that the amount of time the attorney spent on the suit was reasonable. *See id.* at 17, 523 N.W.2d at 203–04. Here, the court found that the time spent was unreasonable. *Hughes* did not address whether attorney conduct during settlement negotiations that frustrates amicable resolution of disputes forcing a protracted and costly court battle can be considered in awarding attorney's fees. We conclude that the trial court did not sanction Ahrens and Kalter for incivility during settlement discussions; rather, as characterized by the trial court, their conduct is symptomatic of an attitude that is not amenable to negotiation and settlement and will only drive up the costs of litigation.

Ahrens received on May 18, 1995. Halloin responded by correspondence on May 22, 1995, refusing to postpone the scheduled deposition because Ahrens refused to discuss resolving this discovery dispute in a rational or amicable manner. Halloin put Ahrens on notice that "this nifty gamesmanship on Aspen's part is not acceptable." Halloin finally emphasized that this was a pointless discovery dispute and the court should not really be bothered with such a minor issue. Subsequently, Ahrens filed a motion to compel discovery and an amended motion to compel discovery. Halloin responded with an emergency motion for a protective order.

Ahrens consistently accused IT of failing to produce and prepare witnesses, of failing to comply with discovery, of lying about its compliance, and of producing illegible copies. In December 1995, IT's corporate counsel transmitted certain documents requested by Ahrens, who then alleged that the documents had not been transmitted; Ahrens subsequently requested that his allegation be ignored. After IT arranged the presence of requested witnesses for a telephone deposition, Ahrens canceled the deposition on the scheduled day. When IT's corporate counsel, Waters, was unavailable for a period of time due to surgery, Ahrens unilaterally concluded that the scheduling of discovery did not require Waters' participation and refused to delay a deposition of IT employees until Waters had recuperated.

Ahrens made overbroad discovery demands. On behalf of Aspen, Ahrens made a discovery demand for all documents relating to a nationwide remediation contract between IT and the Corps of Engineers, a demand which necessitated the production of approximately 100 boxes of documents. When Ahrens relented,

he requested that IT search all of the boxes for approximately twenty categories of documents.

During the discovery phase of this case, relations between the attorneys deteriorated to the point that both Ahrens and Halloin would tape record phone calls. Earlier, Ahrens refused to communicate with Halloin except by written correspondence because he accused Halloin of misrepresenting phone conversations. On at least one occasion, Halloin terminated a telephone conversation with Ahrens because of his "personal insults and vulgar language." Ahrens' incivility was not limited to the attorneys representing IT. IT's corporate counsel wrote the trial court that counsel for the Corps of Engineers and other representatives of the Corps had reported to him that Ahrens used inappropriate and vulgar language in a telephone conversation with representatives of the Corps. The letter did report that Ahrens subsequently apologized.

The incivility of counsel spilled over from discovery disputes into the courtroom. At the hearing on Aspen's motion for summary judgment, the trial court stated its concerns with several legal questions. Ahrens was given the privilege of responding first and completed his argument without interruption except for questions from the judge. Halloin began his response with an assertion of a factual event from the underlying dispute and the following exchange occurred:

MR. HALLOIN: My statement of facts that is on paragraph six states out everything I'm saying.

MR. AHRENS: What's the page, counsel?

MR. HALLOIN: Mr. Ahrens, please let me finish. You can look at page 6 —

MR. AHRENS: What's the page for the record, the page of Mr. Virck's deposition?

MR. HALLOIN: Mr. Vircks attended a meeting at the site where IT notified Aspen—

THE COURT: Just a minute.

MR. HALLOIN: May I continue, your Honor? This is—

MR. AHRENS: No, no, no, no. This is crucial.

A little later in the hearing Halloin attempted to respond to a question from the court:

MR. HALLOIN: Then how do you reconcile that with the conduct after October 18, the suggestion of the repair that would make the dredge work?

MR. AHRENS: This is my point, your Honor. This is crucial. This is a fraud on the court.

THE COURT: Let him finish the argument.

At the same hearing, the trial court attempted to resolve the discovery disputes between the parties. Before any material disputes could be discussed, the following exchange took place:

MR. AHRENS: I have to address this because in his brief Mr. Halloin accused me of using profanity.

MR. HALLOIN: Multiple times.

MR. HALLOIN: Your Honor this—

MR. AHRENS: Mr. Halloin—

THE COURT: Well, we got to get into discovery.

MR. AHRENS: Mr. Halloin, what profanity did I use to you in our conversations?

MR. HALLOIN: You have used both profanity and you have used insulting language to me in multiple conversations.

MR. AHRENS: What profanity did I use to you on November 21?

MR. HALLOIN: I don't recall.

MR. AHRENS: Well, I have a transcript of our conversation. If you will recall earlier this year, and I'll file these affidavits with the court, earlier this year after we had a conversation in May I sent a letter in which I contradicted your letter supposedly confirming our conversation. I did that because I realized I was dealing with an attorney with whom that if you have a conversation you are then subject to having a lie planted.

After several minutes the trial court was able to call a halt to this exchange. The court started to com-

ment, "We had an interesting legal discussion. It's too bad it degenerated into this," when Ahrens attempted to break in and was rebuked by the court. It was at this time the trial court decided a referee would be appointed to handle all further discovery disputes. At a hearing approximately one month later, Halloin was responding to a motion to strike affidavits of witnesses not on IT's witness list when Ahrens interrupted:

MR. AHRENS: We're—

MR. HALLOIN: Please, Gary.

THE COURT: Just a minute.

MR. HALLOIN: Secondly—

MR. AHRENS: Don't address me by my Christian name.

THE COURT: No interplay. Just talk to the court, that's it. That's the rule now. Anybody violates the rule they leave and we deal without them, all right?

At an April 1996 hearing on postverdict motions for attorney's fees, Ahrens responded to Halloin's arguments opposing the motion:

How would competent counsel have dealt with this problem? Even if competent counsel had determined that Aspen was being unreasonable, first of all the basic rule of all litigation is that where there are undisputed amounts due they should be paid immediately without condition. So in this case had Mr. Halloin had a minimum qualification of any lawyer practicing in Waukesha County . . . .

At the same hearing, the court warned Ahrens and Halloin that it was under time constraints. Later when it was trying to conclude oral arguments, the following exchange took place:

MR. AHRENS: Your honor, if I may?

THE COURT: No, that's enough.

MR. AHRENS: No, no. I have to make a record on this.

THE COURT: That's enough.

MR. AHRENS: Please.

THE COURT: That's enough.

MR. AHRENS: This relates to a falsehood—

THE COURT: If you want to make a record—

MR. AHRENS: No, your Honor.

THE COURT: —we're going to adjourn and come back again.

MR. AHRENS: I need 30 seconds, please.

THE COURT: You guys could talk about this—

MR. AHRENS: We did litigate the March—

THE COURT: Relax, will you.

Finally, at a May 1996 hearing on postverdict motions for attorney's fees, Halloin was responding to an argument made by Ahrens when the latter interrupted:

MR. AHRENS: I got to stop here.

THE COURT: No, you're not stopping.

MR. AHRENS: I let him go on this one before.

THE COURT: No, no, don't interrupt.

Our review of the extensive record failed to uncover any clear and justifiable excuse for Ahrens' conduct. *See Chevron*, 176 Wis. 2d at 947, 501 N.W.2d at 20. The conduct in this case was "unprofessional, repeated and egregious." *Id.* at 948, 501 N.W.2d at 21. We are satisfied that Ahrens' conduct was the direct cause of the excessive attorney's fees and costs generated in this case and the trial court's reduction of requested attorney's fees was a suitable sanction.

Aspen complains that IT was equally guilty, if not more so, of incivility but that the trial court has only punished Aspen. We acknowledge that IT is not free of responsibility for magnification of this litigation. However, the issue before this court is not whether IT could recoup expenses caused by its conduct, but whether Aspen should.[8] Aspen's particularized tattling against IT in this appeal serves no purpose.

We are most troubled by Aspen's attempt to place blame on the trial court for the excessive fees and costs. Aspen suggests that the trial court "abdicated its responsibility to determine the cause or take steps to stop" the atmosphere of incivility between the attorneys for both parties. Aspen also implies that it was the trial court's failure to impose order and compel strict obedience to the rules which encouraged the parties to

---

[8] IT's motion for an award of attorney's fees and the taxation of costs on the grounds that the case should never have been filed or gone to trial was denied.

bully one another. Aspen dramatizes how aggressive litigators will take advantage of what it characterizes to be an inactive court. Finally, Aspen criticizes the trial court for not earlier deciding its motion for summary judgment when discovery disputes were looming.

Aspen's argument teeters on the line between permissible and impermissible advocacy with respect to counsel's obligation to maintain the respect due to courts of justice and judicial officers. *See State v. Rossmanith*, 146 Wis. 2d 89, 430 N.W.2d 93 (1988). It is unfortunate that the same absence of civility in the trial court proceedings has also been exhibited in the appeal. Civility is one aspect of professionalism that all attorneys should strive for. *See id.* at 90, 430 N.W.2d at 94.

Although we do not consider Aspen's improper argument, we do conclude that Judge Mawdsley conducted himself in an exemplary manner when confronted with contentiousness between the attorneys. Judge Mawdsley used every effort to keep the attorneys focused on the real issues in dispute. He also recognized that the efficient use of limited judicial resources was not served by micro-managing the parties' discovery disputes.

With respect to its photocopy costs, Aspen claims that the trial court miscalculated the amount due given the number of documents the court found to be necessary for trial. Aspen sought $4368.24 for photocopying costs. The trial court granted costs of $1000 for pretrial photocopies and $1000 for trial-related copies. Aspen does not challenge the trial court's finding that the amount claimed was unreasonable.[9] Rather, it points out that the trial court found that 7000 documents

---

[9] There is no doubt that the finding of "overtrial" led to the trial court's decision to reduce Aspen's claim for photocopies.

were necessary and it approved the making of four sets of those documents for trial. It extrapolates that by allowing only $1000 for trial-related copies, the trial court only allowed recovery of $0.036 per copy. Aspen claims that the photocopy fee it was charged was $0.10 per page and therefore, $2800 should have been granted for trial-related photocopy expenses.

Even if we were to conclude that the trial court intended to reimburse Aspen for each and every photo-copy made for trial,[10] Aspen's claim is only that a miscalculation has been made. We conclude that "[c]ommon sense and practical economic considerations of time, effort and money dictate that such 'mechanical' adjustments, if warranted, to the findings and judgment should first be allowed to occur at the trial court level." *Schinner v. Schinner*, 143 Wis. 2d 81, 93, 420 N.W.2d 381, 386 (Ct. App. 1988). "Failure to bring a motion to correct such manifest errors properly constitutes a waiver of the right to have such an issue considered on appeal." *Id.*

Citing § 814.04(2), Stats., Aspen claims that the trial court was required to tax as costs Aspen's one-half share of the fee charged by the referee appointed by the court to resolve discovery disputes. The amount was $569.50. The same type of claim is made with respect to the $1344 fee for videotape depositions of IT. Aspen

---

The trial court found that "second generation" copies generated in the middle of the litigation were an unreasonable expense.

[10] We do not construe the trial court's findings as requiring an exact calculation of the amounts incurred. In ferreting out expenses caused by "overtrial," the trial court generalized what would be a reasonable photocopying expense. This was a proper exercise of discretion given the trial court's expressed doubts about the proof that Aspen submitted with respect to its photo-copying expenses.

argues that a videotape is an approved method of pre-serving testimony, *see* §§ 804.05(4)(a) and 885.42(1), STATS., and therefore the cost was absolutely taxable under § 814.04(2).

Section 814.04(2), STATS., does not constrain the trial court's exercise of discretion in determining the amount of costs. That provision allows for the recovery of "necessary" disbursements and fees. *Cf. Chalk v. Trans Power Mfg., Inc.*, 153 Wis. 2d 621, 634–35, 451 N.W.2d 770, 776–77 (Ct. App. 1989) (§ 814.04(1)(a), STATS., mandates the amount of attorney's fees taxed as costs). The trial court exercises its discretion in determining what was a necessary cost under § 814.04(2).

As to Aspen's one-half share of the referee's fee, the trial court stated that the fee was a sanction imposed against both parties for the necessity of appointing a referee to control the discovery process. It was a proper exercise of discretion to impose the sanction. *See Chevron*, 176 Wis. 2d at 946, 501 N.W.2d at 20. The trial court properly refused to relieve Aspen of the previously imposed sanction.

The trial court found that it was not necessary to utilize videotape depositions given the nature of the case. It also determined that Aspen was in part to blame for creating an atmosphere of untrustworthiness which prompted its decision to use videotape proceedings. The trial court's determination to disallow the cost of the videotape depositions was a proper exercise of discretion.

In sum, the trial court carefully and correctly exercised its discretion in reducing Aspen's requested attorney's fees and costs to sanction counsel for incivility that was repeated and flagrant. We recognize that during litigation attorneys walk a fine line between

advocacy and improper conduct and sanctions should only be imposed when counsel exceed the proper bounds of advocacy. *See id.* at 949, 501 N.W.2d at 21. In this case, counsel was considerably over that line from the first demand for settlement through the request for fees and costs.

No costs to either party on appeal.

*By the Court.*—Judgment affirmed.